THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
RICHARD SERVER, Defendant-Appellant.

Fourth District   No. 4—85—0673

Opinion filed October 28, 1986.—Rehearing denied November 26, 1986.

Daniel D. Yuhas and Deborah L. Rose, both of State Appellate Defender's Office, of Springfield, for appellant.

Craig H. DeArmond, State's Attorney, of Danville, for the People.

PRESIDING JUSTICE McCULLOUGH delivered the opinion of the court:

On July 1, 1985, the defendant, Richard Server, was convicted by a jury of one count of aggravated criminal sexual assault (Ill. Rev. Stat. 1985, ch. 38, par. 12—14) and two counts of aggravated criminal sexual abuse (Ill. Rev. Stat. 1985, ch. 38, par. 12—16) of his 9-year-old stepdaughter. Judgment was entered on count I (aggravated sexual assault), and the trial court ruled counts II and III merged (aggra-

vated criminal sexual abuse) and entered judgment thereon. On September 19, 1985, the defendant was sentenced to serve eight years for aggravated criminal sexual assault and three years for aggravated criminal sexual abuse to run concurrently. Defendant appeals from the order of the trial court. We affirm.

Defendant alleges four grounds for reversal on appeal: first, that he was not proved guilty beyond a reasonable doubt; second, that expert testimony regarding the "rape trauma syndrome" was improperly admitted; third, that the testimony of a Department of Children and Family Service (DCFS) worker was improperly admitted under the corroborative-complaint provision of the Code of Criminal Procedure of 1963 (the Code) (Ill. Rev. Stat. 1985, ch. 38, par. 115—10); and fourth, the aggravated-criminal-sexual-assault and aggravated-criminal-sexual-abuse statutes are unconstitutional.

The conduct in this case occurred between the time the defendant and his wife separated on August 4, 1984, and the date their divorce was granted on November 7, 1984. During this period of separation, the defendant and his wife established a visitation schedule for her daughter, M.H. (defendant's stepdaughter)—the victim—and their daughter Susan. The schedule consisted of the defendant having custody of the children on Tuesday evenings, Thursday nights overnight, and every other weekend from Thursday night through Monday morning. On November 9, 1984, defendant's wife accused the defendant of sexually abusing her daughter, M.H.

At trial, M.H., who was 10 years old, testified that the defendant sexually assaulted her on two of these visitations, the first being an overnight visit up to four weeks before Halloween. She described in detail how defendant had abused her. M.H. stated that this conduct happened three times on the first night. She then related a second assault where the defendant had again engaged in sexual acts with her. This time, however, due to her age and obvious nervousness, the court, over defense objection, allowed the prosecutor to lead M.H. regarding the details of the activity.

Carol Server (Carol), the defendant's wife, testified that M.H. had approached her on November 9, 1984, crying and upset. M.H. indicated that the defendant "had taken her into his bed and pulled her panties down." Carol stated that she had difficulty believing this and did not officially report it immediately, but waited until January 14, 1985, when she talked to DCFS investigator Pat Ferris. Carol further stated how M.H.'s behavior and attitude changed drastically during this period of time. She indicated how M.H. became a greater discipline problem, started having trouble dealing with her friends,

stopped playing with her friends, and stopped referring to the defendant as "daddy," and instead called him "Richard."

On January 14, 1985, Carol contacted DCFS investigator Ferris, who interviewed M.H. M.H. was then examined by Dr. Elghammer, a local pediatrician. At trial Dr. Elghammer testified that M.H. had a hymenal opening of 9 millimeters. The doctor also testified to the child's medical history, stating that it was necessary and relevant to his diagnosis.

Dr. Elghammer testified to over 32 years' experience as a pediatrician. He had examined several thousand children who were M.H.'s age and specifically examined some 120 children under 10 years old for evidence of sexual abuse or assault in the last two years. It was his opinion that the history given, coupled with the physical examination, were consistent with physical sexual abuse. The expert testimony proffered by the State through Dr. Elghammer was foundationally sound and properly based upon his training, education, and expertise.

Dr. Elghammer never proffered the opinion that M.H. had been sexually abused. Instead, he merely acknowledged that articles in the field of child gynecology strengthened his diagnosis that the history and physical examination were consistent with physical sexual abuse.

The defense tendered an obstetrician gynecologist, Dr. Victoria Nichols, whose entire experience with examination and measurement of hymenal openings for girls the age of M.H. consisted of "perhaps ten or more." She acknowledged that neither pediatrics nor pediatric gynecology were her specialty and further testified that she had never examined or spoke with M.H. Her testimony described the difference of opinion gynecologists have from pediatricians regarding the significance of a doctor's hymenal measurements. She testified that a hymenal measurement of 9 millimeters was normal for a child of 10 years of age.

The final witness for the State, Pat Ferris, testified that she was an investigator for the Department of Children and Family Services. Ferris, who spoke with M.H., stated that M.H. indicated that she had been sexually molested on two occasions by the defendant. This testimony was allowed over defense objection under the corroborative-complaint provision of the Code (Ill. Rev. Stat. 1985, ch. 38, par. 115–10).

The defendant called a number of people who testified to having seen the defendant and M.H. together at times purported to be after the assaults took place. The purpose of such testimony was to indicate that they observed nothing about M.H.'s behavior toward the defend-

ant which caused them concern or which seemed to be abnormal.

The defense also tendered Sherry Huffman, M.H.'s fourth-grade teacher, who testified that M.H. told her that she had been "sexually bothered." Huffman also related how M.H.'s grades dropped around the time she told Huffman about being "bothered." She further indicated M.H.'s attitude and behavior changed at or about that time and that M.H. also stopped calling the defendant "dad" but instead referred to him as "Richard." Huffman also testified about a composition that M.H. had written in early April 1985. The testimony was offered to rebut any indication that M.H. had little knowledge of sexual matters.

The defendant, a 47-year-old practicing attorney and former first assistant State's Attorney for Vermilion County, testified in his own behalf. He denied ever having touched or fondled M.H. at any time. He did, however, acknowledge certain aspects of M.H.'s testimony surrounding the assaults. One of the incidents had begun one night after school started when M.H. and her sister had been sleeping together at the defendant's home and a fight began between the two girls which necessitated their separation. The defendant stated under cross-examination that the incident did occur and M.H. did move into his bed to sleep. He verified that a clock was visible from the bed in his room as M.H. testified. The defendant also stated that he did wear white T-shirts and blue jeans as M.H. had related during her testimony.

M.H. had also testified to another incident where she had been taking a bath at the defendant's home when he entered the bathroom, pulled aside the shower curtain and, when M.H. covered herself with a washcloth, he pulled it away from her, exposing her to his view. The defendant admitted having entered the bathroom on that occasion, and acknowledged he had, in fact, pulled the shower curtain back so he was able to see her in the bathtub. On cross-examination, the defendant admitted to pulling the washcloth away from M.H. and exposing her.

In rebuttal, the State offered the testimony of Donna LeClerc, who was tendered as an expert witness in the area of the rape trauma syndrome. She was first questioned at length outside the presence of the jury before the trial court permitted her testimony before the jury.

LeClerc, a clinical psychologist, had a B.A. in psychology at the time of the trial, and had completed two years of law school. LeClerc testified that she had been working in the area of sexual assault and abuse since 1975. She enumerated all past experience, including par-

ticipation at conferences, workshops and training seminars specializing in child sexual abuse. She listed numerous training sessions that she conducted with various agencies, including medical staffs, Department of Children and Family Services, and police agencies. She further indicated her real work with child sexual assault had been in the last five years and that there was no degree yet available in this area, as it is a relatively new and expanding area of psychological study.

LeClerc indicated that she had previously been qualified in a criminal case to testify as a State's rebuttal witness in the area of "rape trauma syndrome." She also testified in well over three-dozen juvenile cases regarding rape trauma and child sexual assault. She stated that two to three times a year she testifies in civil matters in areas of rape trauma syndrome and child sexual assault.

LeClerc testified that the rape trauma syndrome is a recognized and accepted form of post-traumatic stress syndrome, which is defined in the Diagnostic and Statistical Manual No. III, a learned treatise commonly referred to and utilized by persons in the field of psychiatry.

LeClerc went on to describe the various emotional, physical, and psychological reactions of an individual to a sexual assault. LeClerc did not express an opinion as to whether M.H. was the victim of sexual assault. She did not indicate that the defendant was the assailant. She also did not express an opinion as to the truth or falsity of M.H.'s statements. Her ultimate opinion was simply that M.H. did not exhibit behavior inconsistent with the recognized and accepted emotional, physical, and psychological actions or reactions normally found to exist in child victims of sexual assault. Over defendant's objection, LeClerc was allowed to remain in the courtroom throughout the entire proceeding so that she might observe the victim as she testified and during the course of the proceeding. LeClerc had further talked to M.H. at least once, viewed her videotaped statement to Ferris, read police and investigative reports, and examined M.H.'s writings for school.

■ A conviction for aggravated criminal sexual assault or abuse, where the defendant denies the charge, will be upheld when there is either some corroboration of the testimony of the prosecuting witness or that testimony is otherwise clear and convincing. (*People v. Leamons* (1984), 127 Ill. App. 3d 1056, 1066, 469 N.E.2d 1137, 1145.) It is not necessary that the testimony of the complaining witness be crystal clear and perfect in order to be deemed clear and convincing. (*People v. Powell* (1985), 138 Ill. App. 3d 150, 156, 485 N.E.2d 560, 564.) The credibility of the complaining witness is a question for the

trier of fact, and its determination is entitled to great weight. A reviewing court will not reverse the conviction unless the evidence is so unsatisfactory or improbable that a reasonable doubt as to the defendant's guilt remains. (*People v. Yates* (1983), 98 Ill. 2d 502, 518-19, 456 N.E.2d 1369, 1377-78, *cert. denied* (1984), 466 U.S. 981, 80 L. Ed. 2d 836, 104 S. Ct. 2364, *rehearing denied* (1984), 467 U.S. 1268, 82 L. Ed. 2d 864, 104 S. Ct. 3563.

Where the testimony of the victim is not clear and convincing, it must be substantially corroborated by some other factual evidence or circumstances. (*People v. Leamons* (1984), 127 Ill. App. 3d 1056, 1067, 469 N.E.2d 1137, 1145.) Corroborating evidentiary matters include an eyewitness account, confession or admission by the defendant, prompt reporting of the incident by the victim, or medical testimony which supports allegations of abuse.

At trial M.H. testified to two separate instances involving penetration of her genitals. M.H. estimated the length of the assaults, described the surroundings, described what she was wearing and what the defendant was wearing. She indicated in the first instance it was digital penetration, while in the second, it seemed like a "licking sensation" that went inside.

■ During direct exam, counsel for the State sought court permission to ask M.H. leading questions. Counsel indicated that during interviews M.H. had used specific terminology in describing the two incidents. The court allowed counsel to lead M.H. during direct exam. Such is clearly within the discretion of the trial court, especially when it involves a child of tender years. *People v. Smith* (1957), 11 Ill. 2d 280, 143 N.E.2d 50; *People v. Luigs* (1981), 96 Ill. App. 3d 700, 421 N.E.2d 961.

■ The victim's descriptive, unwavering account of the two incidents is clear and convincing. Furthermore, this testimony was substantially corroborated by the victim's mother, her teacher, DCFS-worker Ferris, and ultimately with the physical corroboration as presented by Dr. Elghammer. The defendant admitted to many factual consistencies in the victim's testimony. As to defendant's medical expert testimony, the fact that a disagreement exists between pediatricians and gynecologists goes to the weight to be given the testimony and not to its admissibility. This is the function of the jury, and the fact that there may be a lack of unanimity in the medical profession concerning the reliability of certain evidence did not render the testimony inadmissible. The evidence was sufficient to prove the defendant guilty beyond a reasonable doubt.

■ Next, the defendant argues that he was denied a fair trial due

to the trial court's admission of expert testimony regarding the "rape trauma syndrome." The defendant maintains that expert testimony on rape trauma syndrome is highly prejudicial, especially when admitted to prove that a sexual act occurred. Consequently, the defendant asserts that Illinois, which has not yet ruled upon the admissibility of this testimony, should follow those jurisdictions which find this to be an improper area for expert testimony.

The defendant further maintains that even if such testimony is deemed admissible in Illinois, LeClerc was not qualified to testify as an expert in this area, arguing a social worker such as LeClerc is trained to recognize certain behavior which may be symptomatic of the "rape trauma syndrome," but is not qualified to draw psychological conclusions. Finally, the defendant argues that there was insufficient foundation for any expert testimony and that it was prejudicial error to allow LeClerc to remain in the courtroom and to observe the child victim throughout the proceedings.

LeClerc, with over nine years' experience with child victims of sexual assault and over 17 years of psychological counseling and experience, testified that the focus on child sexual assault has come to light in the last five or six years. She informed the jury that "rape trauma syndrome" is a term commonly recognized and accepted in psychology, involving the pattern of emotional, physical, and psychological reactions that occur in victims of sexual abuse. She stated that children undergo the same traumatic stress syndrome as do adults, but that children may display more fear, anxiety, and guilt, revert to childlike behavior, have nightmares, and exhibit behavior, sleep, and eating disorders. LeClerc testified that actions of children who are victims of sexual abuse also include nonverbal responses. She stated that victims of sexual abuse often become clinging and dependent, or express hatred for the nonabusive parent, becoming disobedient and arguing with them. She said that behavior disorders may include problems at school, and writing things that may not have been appropriate for that child previously.

The defense had offered testimony about a composition that M.H. had written in early April 1985, several months after the alleged abuse had occurred, to rebut any indication that the child had little knowledge of sexual matters. LeClerc's interpretation of this composition, however, was that it was an oblique reference to having been sexually abused, and that the underlining contained in the composition and the switch from cursive writing to printing was a "call for attention."

Over defense objection, the State's Attorney asked whether the

behavior of M.H. was consistent with the model normally known as the victim of a child sexual assault. LeClerc testified in response to this question that M.H. exhibited no behavior inconsistent with that model.

On cross-examination, LeClerc testified it was common for children to be traumatized by a divorce, to blame themselves, and to engage in attention-getting behavior. She also acknowledged that children will show affection to the parent who has moved out, that schoolwork frequently deteriorates when there is a divorce in the home, and that it is normal for a child to emulate a female adult, such as in cooking or setting a table.

LeClerc ultimately testified that M.H. did not exhibit behavior inconsistent with the recognized and accepted emotional, physical, or psychological actions or reactions normally found to exist in a child victim of sexual assault. She never expressed an opinion as to whether M.H. was a victim of sexual assault. She did not express an opinion that the defendant was the assailant nor did she express an opinion as to the truth or falsity of M.H.'s statements.

In determining whether an error has occurred in admitting expert testimony, the appellate court will not upset the trial court's ruling unless its discretion has been abused. (*People v. Free* (1983), 94 Ill. 2d 378, 410, 447 N.E.2d 218, 233, *cert denied* (1983), 464 U.S. 865, 78 L. Ed. 2d 175, 104 S. Ct. 200, *rehearing denied* (1983), 464 U.S. 1004, 78 L. Ed. 2d 701, 104 S. Ct. 514.) Expert testimony will be admitted when the subject matter is sufficiently beyond the common experience so that only persons of experience and skill are capable of forming a correct judgment as to any connected fact. (*People v. Free* (1983), 94 Ill. 2d 378, 447 N.E.2d 218.) It has also been stated that such testimony will be admitted if the expert has some knowledge or experience which will aid the court or jury in arriving at determinations on the questions at issue. (*Perschall v. Metropolitan Life Insurance Co.* (1983), 113 Ill. App. 3d 233, 237, 446 N.E.2d 570, 573.) Expert testimony is thus admitted to aid the jury, and the credibility of the expert and the weight to be accorded his testimony is a matter for the trier of fact to determine. *People v. Platter* (1980), 89 Ill. App. 3d 803, 819, 412 N.E.2d 181, 191.

The "rape trauma syndrome" is one form of post-traumatic stress disorder which results from sexual assault. (*State v. Marks* (1982), 231 Kan. 645, 647 P.2d 1292.) The condition is caused when a person experiences a very frightening, stressful event and manifests itself in a kind of "psychological hangover." Many experts refer to the "rape trauma syndrome" as "umbrella terminology" and that it includes a

very broad spectrum of physical, psychological, and emotional reactions. (*People v. Bledsoe* (1984), 36 Cal. 3d 236, 203 Cal. Rptr. 450, 681 P.2d 291.) Although broad in spectrum, examination of the psychological literature clearly demonstrates that the rape trauma syndrome is generally accepted to be a common reaction to a sexual assault. *State v. Marks* (1982), 231 Kan. 645, 647 P.2d 1292.

Only a small number of jurisdictions have addressed the issue of the admissibility of evidence regarding the rape trauma syndrome as the subject of expert testimony. (See generally 42 A.L.R.4th 879 (1985).) Of those jurisdictions which have addressed the issue, the majority deem the rape trauma syndrome inadmissible to show either lack of consent on the part of the victim or that a rape did in fact occur. See, *e.g., People v. Bledsoe* (1984), 36 Cal. 3d 236, 203 Cal. Rptr. 450, 681 P.2d 291; *Allewalt v. Maryland* (1985), 61 Md. App. 503, 487 A.2d 664; *State v. Taylor* (Mo. 1984), 663 S.W.2d 235.

The jurisdictions which have admitted testimony regarding the rape trauma syndrome admit this testimony to prove lack of consent (*State v. Marks* (1982), 231 Kan. 645, 647 P.2d 1292) or to show that the mental and emotional conditions of the victim are approximately that of other victims of sexual assault (*State v. Kim* (1982), 64 Hawaii 598, 645 P.2d 1330).

Although Illinois has not yet addressed the admissibility of the rape trauma syndrome, it has admitted expert testimony regarding other "syndromes." Testimony regarding the specific psychological attributes has been admitted for a variety of reasons: to explain why behavior of crime victims may be different from popular perception of the behavior of other crime victims; to explain inconsistencies in the victim's trial testimony or between trial testimony and out-of-court statements; and to explain the defendant's motive for committing a crime with which he or she has been charged. See, *e.g., People v. Platter* (1980), 89 Ill. App. 3d 803, 412 N.E.2d 181 (battered child syndrome); *cf. People v. Minnis* (1983), 118 Ill. App. 3d 345, 455 N.E.2d 209 (trial court must permit offer of proof on asserted defense such as battered woman syndrome).

■ The clear trend in Illinois is toward the admission of expert testimony regarding psychological syndromes where such evidence aids the trier of fact. Cases involving allegations of sexual abuse against children are difficult to prove and equally difficult to defend against. Consequently, prior to admission, expert testimony must be tested and shown to be beneficial to the trier of fact with a minimum of prejudice to the defendant. The courts must look at such evidence with a wary eye. In the case at hand, the testimony was admitted in

rebuttal for the limited purpose of explaining to the jury how child victims of sexual assault react. As such, there was no abuse of discretion.

■ A party who tenders an expert to the court has the burden of establishing the qualifications of the expert. (*People v. Park* (1978), 72 Ill. 2d 203, 380 N.E.2d 795.) The question of whether a party has met its burden with respect to establishing the qualifications of an expert is a matter within the sound discretion of the trial court. The trial court's decision that a particular expert is qualified is subject to reversal only when it constitutes an abuse of discretion. The degree and manner of knowledge and experience required of an expert is directly related to the complexity of the subject matter and the corresponding likelihood of error by one insufficiently familiar therewith. 72 Ill. 2d 203, 210, 380 N.E.2d 795, 799.

■ In the case at hand, LeClerc testified that the field of sexual-assault study is fairly new, having only recently received attention from the authorities. LeClerc indicated to the court that the field is so new that there are no degree courses of study in it yet and that most education in this area is received through clinical interviews and observations of victims. LeClerc was not asked to render a psychiatric or medical opinion. The areas of inquiry were limited to her knowledge of psychological principles with which she had substantial experience. In this respect, the trial court did not abuse its discretion in allowing LeClerc to give expert testimony.

■ ■ The defendant's final three assertions are also without merit. LeClerc did have sufficient foundation to testify about M.H. LeClerc interviewed M.H., viewed her videotaped interview with DCFS, reviewed all police reports, reviewed her schoolwork, and remained in the courtroom throughout the trial to observe M.H. It is within the discretion of the trial court to permit a psychiatrist or psychologist to remain in the courtroom to observe a witness testify and use the observations as a basis for their opinion. (See *People v. Cunningham* (1966), 73 Ill. App. 2d 357, 218 N.E.2d 827.) As such, there was no error in permitting LeClerc to remain in the courtroom to observe M.H.

Finally, the State did notify the defense of their intent to introduce LeClerc approximately one week before trial, when the decision was made. The State, however, had no obligation to do so, as LeClerc was tendered as a rebuttal witness. Upon being duly notified, the defense made no effort to contact LeClerc or procure an expert themselves. As such, there was no error.

■ The defendant next maintains that the testimony of DCFS-

worker Ferris was admitted in violation of the corroborative complaint provisions of the Code. (Ill. Rev. Stat. 1985, ch. 38, par. 115—10.) At trial, Ferris testified that on January 14, 1985, she had a conversation with M.H. during which M.H. told her that she had been sexually molested on two occasions by the defendant. This was the full extent of the testimony, as defense counsel did not cross-examine Ferris.

The corroborative-complaint provisions of the Code allow hearsay testimony to be admitted when a child complains of a sexual act. (Ill. Rev. Stat. 1985, ch. 38, par. 115—10.) The intent of the legislature in adopting this provision was to allow testimony which corroborated the fact that a child under 13 years old made a complaint of sexual abuse to another person. (*In re C.K.M.* (1985), 135 Ill. App. 3d 145, 149, 481 N.E.2d 883, 886.) Consequently, the statute limits testimony to the fact that a complaint was made and it is not to include a detailed account of the complaint or the identity of the alleged assailant.

While a specific recitation of the complaint is not admissible, testimony must necessarily include some detail to effectively corroborate the fact that a complaint was made. (*People v. Powell* (1985), 138 Ill. App. 3d 150, 159, 485 N.E.2d 560, 566.) The admission of unnecessary or impermissible detail, such as the identification of the defendant, will be deemed to be harmless when substantially corroborated by the testimony of the child victim or any other pertinent evidence and the child victim is present in court and available for cross-examination. See *People v. Powell* (1985), 138 Ill. App. 3d 150, 485 N.E.2d 560; *In re R.D.* (1985), 131 Ill. App. 3d 612, 476 N.E.2d 62.

The fact that a complaint is made in response to questions does not necessarily destroy its admissibility under prior law or under section 115—10. (See *People v. Damen* (1963), 28 Ill. 2d 464, 193 N.E.2d 25; *In re C.K.M.* (1985), 135 Ill. App. 3d 145, 481 N.E.2d 883.) Illinois courts continue to admit testimony of nurses, police officers, and social workers who question victims. See *In re R.D.* (1985), 131 Ill. App. 3d 612, 476 N.E.2d 62; *People v. Powell* (1985), 138 Ill. App. 3d 150, 485 N.E.2d 560; *People v. Salas* (1985), 138 Ill. App. 3d 48, 485 N.E.2d 596.

■■■ While it was error for the trial court to allow testimony regarding the identity of the defendant, this error was harmless. The victim, M.H., testified that the defendant had abused her on two occasions. The identity of the defendant was not at issue during the trial. M.H. was further present in the court throughout the proceedings and thus available for cross-examination. Therefore, the testimony of Ferris was substantially corroborated and merely cumulative. As

such, it was within the corroborative-complaint provisions of the Code.

■■■ The defendant's final contention, challenging the constitutionality of the aggravated-criminal-sexual-abuse and aggravated-criminal-sexual-assault statutes, is also without merit. The defendant maintains that the term "penetration" as utilized in the aggravated-criminal-sexual-assault statute is contrary to the commonly understood meaning of the term. Defendant further asserts that the difference between "sexual conduct" and "sexual penetration" as statutorily defined is indiscernible, vague, confusing, and ambiguous.

It is well established that a statute, once enacted, is presumed constitutional and valid. (See *People v. Bales* (1985), 108 Ill. 2d 182, 483 N.E.2d 517.) Where possible, any doubts or uncertainties regarding the validity of the statute will be resolved in favor of the statute. (108 Ill. 2d 182, 483 N.E.2d 517.) A party challenging the validity of the statute has the burden of establishing a substantial constitutional violation. A statute will be held void for vagueness where the statute fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute or is so indefinite that it encourages arbitrary and erratic arrests and convictions. *Colautti v. Franklin* (1979), 439 U.S. 379, 58 L. Ed. 2d 596, 99 S. Ct. 675.

■■■ Where the language of the statute is clear, its meaning should be given effect without resort to supplementary principles of statutory construction. (*People v. Singleton* (1984), 103 Ill. 2d 339, 341, 469 N.E.2d 200, 202.) If the legislature had provided specific definitions of any terms within an enactment, these definitions will be sustained for purposes of the act when reasonable. (*People v. Harman* (1984), 125 Ill. App. 3d 338, 345, 465 N.E.2d 1009, 1015.) Under the Criminal Code of 1961, an accused commits the crime of aggravated criminal sexual assault if he engages in "sexual penetration" (Ill. Rev. Stat. 1985, ch. 38, par. 12—14(b)(1)), and he commits the crime of aggravated criminal sexual abuse if he engages in an act of "sexual conduct" (Ill. Rev. Stat. 1985, ch. 38, par. 12—16(c)(1)). "Sexual penetration" is specifically defined as:

> "[A]ny contact, however slight, between the sex organ of one person and the sex organ, mouth or anus of another person, or any intrusion, however slight, of any part of the body of one person or of any animal or object into the sex organ or anus of another person, including but not limited to cunnilingus, fellatio or anal penetration." (Ill. Rev. Stat. 1985, ch. 38, par. 12—12(f).)

"Sexual conduct" is defined as:

"[A]ny intentional or knowing touching or fondling by the victim or the accused, either directly or through clothing, of the sex organs, anus or breast of the victim or the accused, or any part of the body of a child under 13 years of age, for the purpose of sexual gratification or arousal of the victim or the accused." Ill. Rev. Stat. 1985, ch. 38, par. 12—12(e).

■■ The legislature is not bound by the common understanding and usage of terms and possesses the power to define statutory terms in any reasonable manner. The legislature's decision to redefine "sexual penetration" as "conduct however slight, between the sex organ of one person and the sex organ, mouth or anus of another person," is not in violation of due process of law. (See *People v. Hope* (1986), 142 Ill. App. 3d 171, 491 N.E.2d 785.) It is well within the rights and duties of the legislature to specifically enlarge an element of the crime of sexual assault with the intent of broadening the scope of the statute.

■■ Furthermore, there is no denial of due process when a defendant can be prosecuted for two separate offenses with two different penalties based upon the same conduct. (See *People v. McCollough* (1974), 57 Ill. 2d 440, 313 N.E.2d 462, *appeal dismissed* (1974), 419 U.S. 1043, 42 L. Ed. 2d 637, 95 S. Ct. 614; *People v. Paden* (1984), 123 Ill. App. 3d 514, 462 N.E.2d 989.) The State's Attorney, as a representative of the People, is vested with discretion in authority to evaluate the evidence and other pertinent factors in determining which offense can properly and should properly be charged. (*People v. Paden* (1984), 123 Ill. App. 3d 514, 520, 462 N.E.2d 989, 994.) Thus, even though it is possible that the defendant's conduct could be construed as "sexual conduct" or "sexual penetration" and the defendant could be prosecuted for aggravated criminal sexual assault or aggravated criminal sexual abuse for a single act, this does not constitute a denial of due process.

The language of the aggravated-criminal-sexual-abuse and aggravated-criminal-sexual-assault statues is discernible and clearly defined. As such, the statues are constitutional. The decision of the trial court is affirmed.

Affirmed.

WEBBER and MORTHLAND, JJ., concur.